[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio Manufacturers' Assn. v. Ohioans for Drug Price Relief Act,* Slip Opinion No. 2016-Ohio-5377.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5377

OHIO MANUFACTURERS' ASSOCIATION ET AL. *v*. OHIOANS FOR DRUG PRICE RELIEF ACT ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio Manufacturers' Assn. v. Ohioans for Drug Price Relief Act,* Slip Opinion No. 2016-Ohio-5377.]

*Elections—Initiative-proposal petition—Challenge under Article II, Section 1g, Ohio Constitution—Part-petition signature deletions—Part-petition circulator addresses—Part-petition signature overcounting—Challenge sustained in part.*

(No. 2016-0313—Submitted August 8, 2016—Decided August 15, 2016.)

CHALLENGE under Article II, Section 1g of the Ohio Constitution.

_____

**Per Curiam.**

{¶ 1} This is an original action pursuant to Article II, Section 1g of the Ohio Constitution, challenging the petition signatures submitted in support of the "Ohio Drug Price Relief Act" by respondents Ohioans for Drug Price Relief Act, William

S. Booth, Daniel L. Darland, Tracy L. Jones, and Latonya D. Thurman (collectively, "the committee"). The challengers are the Ohio Manufacturers' Association, Ohio Chamber of Commerce, Pharmaceutical Research and Manufacturers of America, Keith A. Lake, and Ryan R. Augsburger (collectively, "OMA").

{¶ 2} For the reasons set forth below, we sustain the challenge in part. We hold that 10,303 signatures, including the signatures on all part-petitions circulated by Roy Jackson and Kacey Veliquette, were erroneously validated.

**Background**

{¶ 3} On December 22, 2015, the committee submitted approximately 10,029 part-petitions, purportedly containing 171,205 signatures, to the office of Ohio Secretary of State Jon Husted in support of an initiative to enact "The Ohio Drug Price Relief Act" as Section 194.01 of the Ohio Revised Code. Husted transmitted the part-petitions to the county boards of elections for verification of the signatures pursuant to R.C. 3501.11(K). He also sent Directive 2015-40, dated December 23, 2015, which instructed the county boards how to review, examine, and verify the petition signatures. In the directive, Husted ordered the county boards to return their certification forms to his office no later than 12:00 p.m. on December 30, 2015.

{¶ 4} To qualify an initiative for the ballot, supporters must submit petitions that satisfy two criteria. First, the petitions must contain a number of valid signatures that is equal to at least 3 percent of the total number of electors. Ohio Constitution, Article II, Section 1b. Evidence in the record establishes that at present, the minimum number of valid signatures is 91,677. Second, the petition must contain valid signatures equal to at least one-half of the 3-percent threshold number (that is, 1.5 percent of the total number of electors) from at least 44 of Ohio's 88 counties. Ohio Constitution, Article II, Section 1g. As of the December 30, 2015 deadline, the county boards had reported a sufficient total number of valid

2

signatures and a sufficient number of valid signatures in enough counties to meet both constitutional requirements.

{¶ 5} Upon verifying a sufficient number of signatures, the secretary of state is required to transmit the proposed statute and initiative petitions to the General Assembly, as soon as it convenes, for consideration. Ohio Constitution, Article II, Section 1b. The first day of the General Assembly's 2016 session occurred on Monday, January 5. But despite having received sufficient verifications, Husted did not transmit the petitions to the legislature at the start of the session.

{¶ 6} Instead, on January 4, 2016, he issued Directive 2016-01, returning the part-petitions to the county boards with instructions to re-review two aspects of them. First, the directive ordered the boards to determine whether petition signatures were improperly removed (i.e., crossed out) by unauthorized persons. And second, the directive ordered the boards to investigate whether circulator statements were invalid due to systematic signature overreporting (i.e., preaffixing the number of signatures purportedly witnessed by the petition circulators to part-petitions containing fewer actual signatures). Husted ordered the boards to complete this review and recertify their results by January 29, 2016.

{¶ 7} On February 4, 2016, Husted advised the committee that the petition contained 96,936 valid signatures, more than the 91,677 required. He also advised the committee that signatures from 47 counties met the constitutional threshold (more than the required 44) and that the constitutional requirements were "fully satisfied." He transmitted the initiative and petition to the General Assembly.

## Procedural History

{¶ **8**} On February 29, 2016, OMA commenced this original protest action. The protest complaint identified three defects[1] in the part-petitions which, OMA alleged, should cause them to be discounted in their entirety:

1. Contractors crossed out signatures on part-petitions, in violation of R.C. 3519.06(C).

2. Some petition circulators listed nonresidential addresses as their permanent addresses, in violation of R.C. 3501.38(E)(1).

3. More than 1,400 part-petitions contain false circulator statements because they contain fewer signatures than the circulator attested to witnessing, in violation of R.C. 3501.38(E) and 3519.06(D).

OMA requested an "order and/or judgment declaring" the part-petitions and signatures thereon invalid, and an "order and/or judgment" that the petition failed to meet the requirements of Article II, Section 1b.

{¶ **9**} We issued an opinion denying the committee's motion for judgment on the pleadings, ___ Ohio St.3d ___, 2016-Ohio-3038, ___ N.E.3d ___, and on June 1, 2016, OMA made an equivocal request for an evidentiary hearing, stating that the challengers "will not know for certain whether they need an evidentiary hearing until outstanding discovery is completed." OMA never renewed this request, and on August 15, 2016, withdrew the request.

{¶ **10**} On May 13, 2016, OMA filed a motion for partial summary judgment. We deny that motion as moot. The parties have submitted merit briefs and evidence, and the case is ripe for adjudication on the merits.

---

[1] OMA also alleged that five circulators of part-petitions were felons and were therefore incompetent to circulate or witness the signing of petitions under R.C. 2961.01(B). OMA has indicated that it is no longer pursuing that allegation.

**Analysis of the Alleged Petition Defects**

*First Allegation: Signature Deletions*

{¶ 11} Ashland County part-petition no. 000007 is a typical example of a signature deletion. The statement of circulator Larry Boyce indicates that he witnessed 28 signatures. And indeed, Ashland County part-petition no. 000007 has a signature on each of its 28 lines. However, one signature, on line 2, has been blacked out with a marker. In its review, the board of elections determined that two signatures—those on lines 4 and 21—were invalid. The board therefore certified 25 valid signatures. The principal claim in this protest is that Ashland County part-petition no. 00007, and thousands of similar part-petitions, should be invalidated in their entirety, based on the theory that someone other than the circulator or signer blacked out at least one signature.

{¶ 12} We reject this aspect of the challenge.

{¶ 13} The Revised Code affirmatively permits three persons to delete a signature from a petition, so long as the deletion occurs before the petition is filed: (1) the circulator, (2) the signer, or (3) the "attorney in fact" for any signer. R.C. 3501.38(G) and (H). OMA contends that the blacking out of signatures on Ashland County part-petition no. 00007 and other part-petitions was done by unauthorized persons and that this defect renders all of those part-petitions invalid.

{¶ 14} OMA's merit brief relies primarily on the testimony of Pamela Lauter, who coordinated some of the petition circulators. Lauter described a process that she called "purging the deck," which involved persons other than the circulators reviewing the part-petitions after the circulators had turned them in and removing invalid signatures by highlighting them with a black, washable magic marker, not crossing them out. But she insisted that the signatures remained visible after the highlighting and denied ever using a black "Sharpie" marker that would have made the signatures unreadable. Unfortunately, the specific "highlighted" part-petitions she discussed were not identified for the record.

**{¶ 15}** Other evidence confirms that the circulators were not responsible for the deletions of this type. Four petition circulators, Vikki Moore, Marquita Barnhouse, Gloria Torrence, and Rebecca Douglas, denied crossing names off the part-petitions they circulated. And Angelo Paparella, president and owner of PCI Consultants, Inc., the head contractor for the petition drive, testified that PCI operates an out-of-state processing center at which validators review the part-petitions and strike out invalid signatures before returning the part-petitions to the client.

**{¶ 16}** The evidence therefore shows that signature deletions occurred that were not authorized by R.C. 3501.38(G) and (H). But OMA is mistaken in its belief that the remedy for such a violation is to invalidate the entire part-petition.

**{¶ 17}** The limited grant of authority to remove a signature serves two purposes: it protects the ability of petition signers to change their minds and remove their signatures, so long as they do so in a timely manner. And it protects circulators from the potential Hobson's choice that would arise if they discover that a petition signature is invalid: either (1) submit a false R.C. 3501.38(E)(1) circulator statement attesting that all the petition signatures are, to the best of the circulator's knowledge and belief, valid or (2) forego the entire part-petition with all its valid signatures. R.C. 3501.38(G) permits the circulator to avoid this dilemma by striking the invalid signature and adjusting the signature count accordingly. *See Rust v. Lucas Cty. Bd. of Elections*, 108 Ohio St.3d 139, 2005-Ohio-5795, 841 N.E.2d 766, ¶ 14.

**{¶ 18}** By implication, R.C. 3501.38(G) and (H) give notice that *only* circulators, signers, and authorized representative may strike signatures. This tacit limitation guards an even more fundamental interest: it protects electors who sign petitions from having their signatures surreptitiously deleted, as Husted acknowledged in Directive 2016-01 when he ordered the boards to investigate the deletions:

6

> Most importantly, [these statutes] serve to protect the registered Ohio voters exercising their right under the state constitution to petition state government (in this case, to propose a state law for consideration by the General Assembly) from having their signature improperly removed from a part-petition.

To return to the example of Ashland County part-petition no. 00007, the logical remedy for an unauthorized deletion would be to count the crossed-out signature (assuming it is otherwise valid), not to invalidate the 25 indisputably valid signatures from eligible voters. Adopting OMA's position would have the perverse effect of rewarding a petition opponent when a part-petition has been unlawfully altered.

{¶ 19} Petition proponents, who want to submit as many valid signatures as possible, have no incentive to delete signatures improperly. Certainly OMA has identified no theory as to how petition advocates would benefit from making unauthorized cross-outs or how such a practice jeopardizes the interests discussed above. According to Lauter, circulation coordinators highlighted signatures for "payroll purposes," that is, to avoid paying circulators for invalid signatures on the front end, rather than having to "charge-back" the expense. Indeed, the Butler County Board of Elections reported after the re-review that 79.59 percent of the marked-out signatures were facially invalid and would have been declared invalid by the board if they had not already been stricken.

{¶ 20} Invalidating the entire part-petition because of an unauthorized deletion would serve no public interest and would turn the implicit protection afforded by R.C. 3501.38(G) and (H) on its head. For this reason, we also reject OMA's claim that the part-petitions should be invalidated under R.C.

3501.39(A)(3) on the grounds that they violate the requirements of R.C. Chapter 3501.

{¶ 21} R.C. 3501.38(G) and (H) do not expressly state that a part-petition containing an unauthorized deletion is invalid. So for legal authority, OMA turns to R.C. 3519.06, which provides:

> No initiative or referendum part-petition is properly verified if it appears on the face thereof, or is made to appear by satisfactory evidence:
>
> (A) That the statement required by section 3519.05 of the Revised Code is not properly filled out;
>
> (B) That the statement is not properly signed;
>
> (C) That the statement is altered by erasure, interlineation, or otherwise;
>
> (D) That the statement is false in any respect;
>
> (E) That any one person has affixed more than one signature thereto.

OMA asserts that the deletion of signatures violated R.C. 3519.06(C), rendering any part-petition containing deleted signatures invalid in toto.

{¶ 22} The flaw in this argument is that the phrase "the statement," as used throughout the election code, is a term of art: it refers specifically to the circulator's attestation as to the number and validity of signatures on the part-petition. And the signature pages are not part of the attestation statement.

{¶ 23} The term "statement" first appears in Article II, Section 1g of the Ohio Constitution, which mandates that "[t]o each part of such petition shall be attached the statement of the circulator, as may be required by law, that he witnessed the affixing of every signature." It also appears in R.C. 3501.38(E)(1):

8

"On each petition paper, the circulator * * * shall sign a statement," under penalty of election falsification, that (1) the circulator witnessed the affixing of every signature, (2) all signers were to the best of the circulator's knowledge and belief qualified to sign, and (3) every signature is to the best of the circulator's knowledge and belief the signature of the person whose signature it purports to be or of the person's attorney in fact. R.C. 3519.06(C), which prohibits alterations to "the statement," plainly does not apply to the signature pages because those pages are not part of the circulator statement described in Article II, Section 1g and R.C. 3501.38(E)(1).

{¶ 24} OMA would have us hold that R.C. 3519.06(C) prohibits alterations to any portion of the petition, not just the circulator's statement. OMA's argument is as follows: R.C. 3519.06(A) provides that a petition is invalid if "the statement required by section 3519.05 of the Revised Code is not properly filled out"; R.C. 3519.05 offers model language for a complete part-petition, including the signature pages as well as the circulator's statement; and by using the phrase "the statement required by section 3519.05 of the Revised Code," the General Assembly meant to prohibit alterations to *any portion* of the part-petition.

{¶ 25} But OMA's statutory construction would create redundancies and contradictions in the Revised Code. If R.C. 3519.06(A) means that a part-petition is invalid if *any portion* of the petition is improperly filled out, then R.C. 3519.06(E), making a petition invalid if it contains two signatures from the same person, is redundant. And if R.C. 3519.06(C) imposes a blanket prohibition on alterations to the signature pages, then it conflicts with R.C. 3501.38(G) and (H), discussed above, which expressly authorize alterations to the signature pages.

{¶ 26} It is generally our obligation to defer to the secretary of state's reasonable interpretation of an election statute. *State ex rel. Cornerstone Developers, Ltd. v. Greene Cty. Bd. of Elections*, 145 Ohio St.3d 290, 2016-Ohio-

313, 49 N.E.3d 273, ¶ 16. However, Husted has vacillated on his interpretation of this statute.

{¶ 27} When first confronted with the deletions, he did not invalidate the part-petitions, even though under OMA's theory, they were defective on their faces. Consider, for example, Madison County part-petition no. 000024. The circulator attested to witnessing four signatures, and indeed lines one through four contain signatures. But someone ran a black line through the signatures on lines one and three, and the board of elections validated the other two signatures. So either someone other than the circulator struck two signatures or the circulator crossed them out and then misreported the number of signatures in his statement. Either way, if Husted had agreed with OMA's legal position, then he should have declared part-petitions of this type to be invalid. But he did not do so.

{¶ 28} Instead, he ordered the boards to conduct their re-review, but, of critical importance, *he did not instruct the boards to disqualify petitions containing unauthorized deletions*. In fact, he gave no clear guidance on that point. The guidance that he did provide, in Directive 2016-01, quoted above, strongly suggested that unauthorized deletions pose a problem because they potentially remove valid signatures that should be counted—not because they invalidate the entire part-petitions that contain them.

{¶ 29} But then, at the conclusion of the re-review, Husted appears to have changed his position. He took the extraordinary step, based on Lauter's testimony about "purging the deck," of unilaterally invalidating every part-petition circulated in Cuyahoga County by DRW Campaigns, L.L.C., and Ohio Petitioning Partners, L.L.C. And he explained his decision by using the legal reasoning urged by OMA. He also endorsed OMA's statutory construction in his memorandum in response to the committee's motion for judgment on the pleadings. Given this history, we hold that the secretary of state has not announced a definitive statutory interpretation that warrants our deference.

{¶ 30} In addition, this aspect of OMA's challenge fails for lack of evidence. OMA's complaint asserts that there are signature strike-throughs on approximately 5,598 part-petitions. The strike-through problem regarding 4,579 of those part-petitions allegedly invalidates 63,759 signatures, according to a spreadsheet prepared by a litigation-support manager of the law firm representing OMA. But OMA has not submitted evidence regarding who deleted those signatures. This evidence would not be difficult to compile: if the number of signatures reported by the circulator in the statement includes the lines blacked out, then the logical inference is that someone else deleted the signatures after the part-petition left the circulator's hands. But OMA has not done such an analysis. Rather, it merely asks the court to create a conclusive presumption of invalidity, one that would discard tens of thousands of valid signatures affixed by Ohio voters. We decline to do so.

{¶ 31} This decision is consistent with Husted's own actions at the end of the re-review. He invalidated signatures only from Cuyahoga County because he concluded that he "lack[ed] sufficient evidence to invalidate part-petitions beyond those in Cuyahoga County where the testimony was actually presented." The evidence in the record before us is no stronger than the evidence available to the secretary of state, at least with respect to signatures collected in Franklin County, Hamilton County, and throughout the state. For example, when Paparella, the head contractor for the petition drive, was shown copies of sample part-petitions during his deposition, he was unable to tell just from the ink used whether the strike-outs were done by employees at the processing center or were done by the circulators in the field or by field managers.

{¶ 32} We reject OMA's first signature challenge.

### Second Allegation: False Circulator Addresses

{¶ 33} OMA also challenges the number of valid signatures on the ground that four circulators allegedly submitted false information in their circulator

statements. R.C. 3501.38(E)(1) requires petition circulators to execute a statement on each part-petition containing, among other information, "the circulator's name, *the address of the circulator's permanent residence*, and the name and address of the person employing the circulator to circulate the petition, if any." (Emphasis added.) According to OMA, circulators Fifi Harper, Kelvin Moore, Roy Jackson, and Kacey Veliquette violated this provision by providing addresses that were not "permanent residences," and as a result, the part-petitions they circulated should be invalidated in their entirety. We agree as to two of the four circulators.

*Fifi Harper*

{¶ 34} Harper was hired in 2015 to circulate part-petitions for the committee. On these part-petitions, she listed her address as "4022 East Greenway Road, #11312 Phoenix, Arizona 85032" ("the Greenway address"). According to evidence submitted by OMA, the Greenway address is for "Pack Ship and Print Center," a business in a "strip plaza." Harper concedes in an affidavit that the Greenway address is a business facility that hosts mailboxes. The affidavit of the owner of the business at the Greenway address confirms that the building is not residential, that Harper does not live there, and that she rented mailbox no. 312 in August 2015.

{¶ 35} The requirement that a circulator provide a permanent address serves the important function of ensuring that a board of elections can contact the circulator in the event that complications arise during the verification process. *See In re Protest of Brooks*, 155 Ohio App.3d 370, 382, 2003-Ohio-6348, 801 N.E.2d 503 (3d Dist.2003) (stating that one reason petition circulators are required to state the address of the person or entity compensating them is so that the payor can be contacted if complications arise in the verification process). The evidence in the record demonstrates that Harper met this requirement. The mailbox at the Greenway address is, according to Harper, "the only location at which I can be contacted that is of a permanent, on-going nature" and "the only place from which

12

when I am absent I have a specific present intention to return." We therefore decline to invalidate the part-petitions that Harper circulated.

*Kelvin Moore*

{¶ 36} Moore's declared address on part-petitions he circulated was 3143 West 33rd Street, Cleveland, Ohio. OMA submitted an affidavit from a private investigator, who states that "Dave" told him that he (Dave) owns the property, that only businesses are located there, and that no one named Kelvin Moore resides there. In a second affidavit, a process server states that he rang the buzzer for a suite in the secured building and a woman told him over the intercom that there was no Kelvin Moore in the building. Both affidavits constitute inadmissible hearsay. Because there is no admissible evidence in the record to impugn the address Moore gave, we decline to invalidate the part-petitions he circulated.

*Roy Jackson and Kacey Veliquette*

{¶ 37} Jackson listed his address on part-petitions he circulated as 2100 Brice Road, Reynoldsburg, Ohio. That address is the location of a Days Inn and Suites. Records from the Days Inn and Suites show that Jackson was a guest there in October 2015. The address Veliquette stated on the part-petitions she circulated was 1900 S. Ocean Blvd., Myrtle Beach, South Carolina, 29577. That address is the location of the Shady Rest Motel, which has no record of a person named Kacey Veliquette staying at the motel in 2015 or 2016 or being a permanent resident there. Therefore, the evidence establishes that Jackson and Veliquette listed nonpermanent, nonresidential addresses on their circulator statements.

{¶ 38} Rather than dispute this conclusion, the committee challenges the constitutionality of R.C. 3501.38(E)(1).[2] According to the committee's evidence,

---

[2] We deny OMA's motion to strike the committee's constitutional challenge on the grounds of waiver. Generally, the question of a statute's constitutionality must be raised at the first opportunity. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15. However, OMA has identified no decisional support for the proposition that in a civil case, an opposing party who does not plead the unconstitutionality of a statute as an affirmative defense waives the argument.

professional petition circulators often do not maintain a permanent residence, due to the nomadic nature of their work. For example, Harper attests that she has no permanent address due in large part to the constant travel associated with her employment as a professional petition circulator. Based on this evidence, the committee asserts that R.C. 3501.38(E)(1) is unconstitutional because it prevents transients from circulating petitions.

{¶ 39} But while the record contains evidence establishing Harper's lack of a permanent residence and her establishment of a permanent mailing address, it contains no comparable evidence of Jackson's residential status. Thus, a factual predicate for an as-applied constitutional challenge to the statute has not been established.

{¶ 40} The record contains an affidavit from Veliquette explaining that she, too is a transient circulator. And her affidavit explains why she chose to put the address of the Shady Rest Motel on her circulator statement. But it does not establish that she could actually be contacted at that location. Therefore, her part-petitions could be deemed valid only if we were to rule that it is unconstitutional to require circulators to provide *some means* of locating them. To the contrary, we hold that such a requirement is a sufficient state interest to justify the statute under any level of scrutiny.

{¶ 41} We therefore hold that the part-petitions circulated by Jackson and Veliquette should not have been validated, and we invalidate all of the signatures contained on those part-petitions.

### *Third Allegation: Signature Overcounting*

{¶ 42} R.C. 3501.38(E)(1) requires petition circulators to indicate the number of signatures on each petition paper and to sign an attestation that they personally witnessed each signature. A part-petition is not "properly verified" if "it is made to appear by satisfactory evidence * * * [t]hat the statement is false in any respect." R.C. 3519.06(D).

14

**{¶ 43}** The evidence establishes a substantial problem of overcounting. As an example, Allen County part-petition no. 000005 contains six signatures, five of which the board of elections counted as valid. The remaining 22 signature lines are blank. But the circulator statement indicates that the circulator witnessed 28 signatures. In addition, multiple circulators during hearings before boards of elections looked at part-petitions that they themselves had circulated and testified that the stated number of witnessed signatures—in those situations, as in this example, 28—was not in their handwriting.

**{¶ 44}** The requirement that a circulator state the number of signatures personally witnessed "is a protection against signatures being added later." *State ex rel. Loss v. Lucas Cty. Bd. of Elections*, 29 Ohio St.2d 233, 234, 281 N.E.2d 186 (1972) (invalidating a candidate part-petition when the line indicating the total number of signatures witnessed was left blank). We are not dealing here with a case of minor or negligent miscounts. Systemic overcounts of the magnitude seen in this case are an open invitation to fraud and make this case different from all previous cases cited by the parties. Because a board of elections has no way to know how many signatures the circulators actually witnessed, there is no guarantee that someone did not later add the signatures of legitimate electors who did not choose to sign (or did not even know that their names were being placed on the petition). And of course, a part-petition of this type is invalid because, on its face, the attestation of the circulator is false: he or she did not witness the number of signatures indicated.

**{¶ 45}** We therefore invalidate the part-petitions with overcounts, as specified in the next section.

**Remedy**

**{¶ 46}** For the reasons stated above, we deny OMA's motion to strike and deny OMA's motion for partial summary judgment as moot. Consistent with our opinion, we invalidate 297 signatures on the part-petitions submitted by Roy

Jackson. We invalidate 632 signatures on the part-petitions submitted by Kacey Veliquette. And as to the part-petitions with overcounts, we invalidate 9,374 signatures.[3] In total, OMA has demonstrated that 10,303 signatures that were counted as valid should not have been counted. The petition therefore contained 86,633 valid signatures, which means that it was short of the 91,677 signatures required by 5,044 signatures.

**{¶ 47}** Pursuant to Article II, Section 1g of the Ohio Constitution, the committee has until Thursday, August 25, 2016 (ten days from the date of this order), to submit a sufficient number of valid signatures to the secretary of state. If the secretary of state certifies enough valid signatures, then he shall resubmit the initiative to the General Assembly, in accordance with the terms of Ohio Constitution, Article II, Section 1b.

Motions denied

and challenge sustained in part.

FRENCH, J., concurs, and concurs with an opinion.

O'CONNOR, C.J., concurs in part and dissents in part, with an opinion.

O'DONNELL, J., concurs in part and dissents in part, with an opinion that KENNEDY, J., joins.

LANZINGER, J., concurs in part and dissents in part, and would sustain the relators' first allegation and sustain the relators' second allegation as to all four circulators.

O'NEILL, J., concurs in part and dissents in part, with an opinion.

PFEIFER, J., dissents, with an opinion.

_____

---

[3] This number does not include the invalidated signatures on the part-petitions submitted by Jackson and Veliquette, so as to avoid double-counting.

**FRENCH, J., concurring.**

{¶ 48} I agree with the court's resolution in this case. I write separately, however, to raise a concern regarding the Ohio Constitution's provisions for initiative petitions to enact laws.

{¶ 49} The Ohio Constitution reserves to the people of Ohio "the power to propose to the General Assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided." Ohio Constitution, Article II, Section 1. But neither the people nor the public officials elected to accommodate them can effectively exercise that constitutional power under deadlines and timelines that no longer make sense.

{¶ 50} This case highlights the unworkable timeline that Article II, Sections 1b and 1g impose and the need to amend it. Considering the complexity of the initiative-and-referendum process for enacting laws and the large number of signatures that must be collected and verified, getting an initiative on the first general-election ballot following its submission to the secretary of state becomes nearly impossible when the process spawns litigation, as it so often does.

{¶ 51} As an illustration, consider the ten-day time period that Article II, Section 1b gives the secretary of state to review the signatures and submit the petition to the General Assembly—a timeline that is obviously insufficient for a *meaningful* review of the approximately 171,000 signatures the committee submitted in this case. Here, the secretary took the reasonable action of requiring additional review by the boards of elections, and by doing so, he missed the deadline for submission to the General Assembly and pushed all subsequent deadlines closer to the November election. That delay, combined with the delay resulting from the current litigation, doomed any chance of the initiative appearing on the November 2016 ballot.

{¶ 52} The system is broken and calls for modern amendments to fix it. I respectfully ask the Ohio Constitutional Modernization Commission and the

General Assembly to address these issues and prevent another situation like this from arising.

_____

**O'CONNOR, C.J., concurring in part and dissenting in part.**

{¶ 53} I agree with the majority's decision to validate the signatures on the part-petitions circulated by Fifi Harper and Kelvin Moore and to invalidate the signatures on the petitions circulated by Roy Jackson and Kacey Veliquette.

{¶ 54} But in the absence of any showing of fraud, I dissent from the majority's decision to sustain the allegation of signature "overcounting." Going forward, the majority's decision to strike valid signatures in this case based on "overcounting," with no showing of fraud, will have unintended consequences for every prospective candidate for any elected office in Ohio.

{¶ 55} Finally, I dissent from the majority's decision to require the secretary of state to return the initiative to the General Assembly. If the signatures are sufficient, "the amendment, proposed law, or law shall be placed on the ballot as required by law." R.C. 3519.16(F).

_____

**O'DONNELL, J., concurring in part and dissenting in part.**

{¶ 56} R.C. 3501.38(E)(1) requires petition circulators to execute a statement on each part-petition containing "the circulator's name, *the address of the circulator's permanent residence*, and the name and address of the person employing the circulator to circulate the petition, if any." (Emphasis added.)

{¶ 57} Clearly, Fifi Harper did not do that. The address she provided on the part-petitions she circulated is, in fact, a private mail box at "Pack Ship and Print Center," a business in a commercial strip mall. It is not a residential address, and Harper never lived there. Rather, at the time she obtained that mail box, she lived at 4802 N. 12th Street, Apt. 2102, Phoenix AZ 85014-4094, the address that is apparently still listed on her Arizona driver's license. It may be true, as Harper

18

claims, that she no longer lives at that address and that she did not have any permanent residence at the time that she circulated the part-petitions at issue in this case, but that does not permit her to disregard Ohio's election law by making the untrue representation in her circulator's statement that a nonresidential address is a residential address. If she truly lacked a permanent residential address, then she should not have provided one, rather than knowingly listing a nonresidential address in violation of R.C. 3501.38(E)(1).

{¶ 58} Thus, in my view, the part-petitions she circulated containing a false residential address are invalid and should be stricken in all respects. R.C. 3519.06(D); *see also Kyser v. Cuyahoga Cty. Bd. of Elections*, 36 Ohio St.2d 17, 23, 303 N.E.2d 77 (1973) (a post office box is not an elector's "residence" for purposes of Ohio elections law). Without these part-petitions, the Committee for Ohioans for Drug Price Relief Act did not obtain the requisite number of valid signatures from 44 of 88 Ohio counties as required by Article II, Section 1g of the Ohio Constitution, and the matter should not have been submitted to the General Assembly in the first instance.

{¶ 59} For these reasons, I would declare that the committee must cure the petition deficiency by submitting a sufficient number of valid signatures to the secretary of state within the ten-day period provided by Article II, Section 1g of the Ohio Constitution and R.C. 3519.16(F). Only then may the petition be lawfully transmitted to the General Assembly for consideration.

{¶ 60} Accordingly, to that extent, I respectfully dissent.

KENNEDY, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., concurring in part and dissenting in part.**

{¶ 61} I concur in all aspects of the court's opinion except for the remedy. R.C. 3519.16(F) clearly anticipates a signature shortage. The statute gives respondents ten days to cure their shortage and gives the secretary of state until 65

days prior to the election to determine the sufficiency of the additional signatures. R.C. 3519.16(F). "If they are sufficient, the amendment, proposed law, or law shall be placed on the ballot as required by law." *Id.*

{¶ 62} We are currently 85 days before the election. Implementation of the remedy is not our job. Interpretation of the law is.

————————————

**PFEIFER, J., dissenting.**

{¶ 63} As I stated in my dissent in *Ohio Manufacturers' Assn. v. Ohioans for Drug Price Relief Act*, ___ Ohio St.3d ___, 2016-Ohio-3038, ___ N.E.3d ___ ("*OMA I*"), I would dismiss this case because this courts lacks jurisdiction. It lacks jurisdiction because the challenge procedure set forth in Article II, Section 1g of the Ohio Constitution does not apply to proposal petitions filed pursuant to Article II, Section 1b. This court has taken on the wrong job and has done the job wrong, to the long-term detriment of Ohio election law.

Jurisdiction

{¶ 64} Article II, Section 1g was amended through an Article II, Section 1a initiative in 2008. 2008 Am.H.J.R. No. 3 (adopted by Ohio voters in the November 4, 2008 general election). The amendment created an important role for this court in resolving challenges to petitions for statewide ballot measures: "The Ohio supreme court shall have original, exclusive jurisdiction over all challenges made to petitions and signatures upon such petitions under this section." Ohio Constitution, Article II, Section 1g. But since the passage of the constitutional amendment, this court has never been called upon to resolve a challenge to an Article II, Section 1b proposal petition. The hands-on practicalities of dealing with this case—including the absurd timelines discussed below in the "Remedy" section of this opinion—demonstrate that the challenge procedures outlined in Article II, Section 1g are inapplicable to Article II, Section 1b proposal petitions. Instead, those procedures apply to petitions for initiatives for constitutional amendments

(Article II, Section 1a), petitions for referendums (Article II, Section 1c), and supplementary petitions for initiatives to enact laws (Article II, Section 1b). All of those petitions share the same filing deadline of 125 days before the election. And all of those petitions, properly signed and filed, directly result in an initiative or referendum appearing on the ballot; in contrast, a properly signed and filed Article II, Section 1b proposal petition results only in the proposed law receiving consideration by the General Assembly.

{¶ 65} This court's jurisdiction under Article II, Section 1g does not begin until the filing that determines the election at which the initiative or referendum will be voted upon by the electorate. Article I, Section 1g states that "[a]ny challenge to a petition or signature on a petition shall be filed not later than ninety-five days *before the day of the election*." (Emphasis added.) At this point in this case, there is no "day of the election" from which to measure this jurisdictional timeline. An Article II, Section 1b proposal petition with sufficient signatures does not result in getting an initiative on the ballot; it merely allows citizens to force the General Assembly to consider the proposed law. It is the *supplementary* petition that results in the initiative getting on the ballot. Under Article II, Section 1b, the election concerning the initiative is "the next regular or general election occurring subsequent to one hundred twenty-five days *after the supplementary petition is filed*." (Emphasis added.) Thus, the election day from which deadlines for a challenge under Article II, Section 1g are calculated is not even set until after the filing of the supplementary petition. There is no challenge process available before this court until the supplementary petition is filed—and that has not yet happened. This case does not belong here.

Overcounts

{¶ 66} Twice, the part-petitions in this case have been sent out to county boards of elections for verification. The county boards have painstakingly reviewed each signature on each part-petition and have verified that they are the

21

signatures of registered voters. The professionals have done their jobs, determining that registered Ohio voters have signed the part-petitions calling for the Ohio Drug Price Relief Act to be submitted to the General Assembly for its consideration. The secretary of state has certified that there were sufficient petition signatures to merit the submission of the proposed law to the General Assembly. It was submitted to the General Assembly. More than six months later, this court, somehow, determines that that never happened.

{¶ 67} How the court gets to the conclusion has profound implications for future election cases. Most notably, this court invalidates around 9,000 signatures—which nobody disputes were genuine—because the circulators overstated the number of signatures contained on individual part-petitions. The term of art is "overcounting." In a practical sense, overcounting is corrected at the county level—workers for the boards of elections review every signature and count only the ones belonging to and matching with registered voters in the particular county. The Ohio Secretary of State's *2015 Election Official Manual*, Chapter 11, Section 1.03(D), at 11-9, *http://www.sos.state.oh.us/sos/upload/elections/ EOResources/general/2015EOM.pdf (accessed Aug. 11, 2016)*, discusses how election officials should handle overcounts:

> **If the number of signatures reported in the statement is equal to or greater than** the total number of signatures not crossed out on the part-petition, then the board does not reject the part-petition because of the inconsistent signature numbers. [Citing *State ex rel. Citizens for Responsible Taxation v. Scioto Cty. Bd. of Elections*, 65 Ohio St.3d 167, 602 N.E.2d 615 (1992).] Instead, the board must review the validity of each signature as usual.

> **Example**: The circulator's statement indicates that the circulator witnessed 22 signatures, but there are only 20 signatures on the petition.
>
> **Note**: In determining whether the number of signatures reported by a circulator of a non-statewide candidate's petition matches the number of signatures on that part petition, particularly with regard to crossed out signatures, board of elections should take care so as to not make a determination that is "too technical, unreasonable, and arbitrary" given the unique fact set of that petition and information available to the board, if any. [Citing *State ex rel. Schwarz v. Hamilton Cty. Bd. of Elections*, 173 Ohio St. 321, 181 N.E.2d 888 (1962); *State ex rel. Curtis v. Summit Cty. Bd. of Elections*, Slip Opinion No. 2015-Ohio-3787.]

(Boldface sic.)

{¶ 68} On the other hand, the same source states that when the circulator attests to having witnessed a lesser number of signatures than those that appear on the part-petition, the secretary of state's policy is to strike the entire part-petition. *Id.* This difference in treatment at least makes intuitive sense: if a circulator states that he or she witnessed 20 signatures and there are 22 signatures on the part-petition, that means that there are two that he or she did not witness. How can the reviewing board of elections be expected to tell which signatures the circulator didn't witness? On the other hand, if there are 22 signatures and the circulator states that he or she witnessed 28, the circulator has attested to having witnessed at least 22.

{¶ 69} When the secretary of state returned the part-petitions for re-review, he instructed the county boards of elections to carefully review overcounts:

The Ohio Supreme Court has accorded flexibility to circulators, providing that "… arithmetic errors will be tolerated, but only if the error does not promote fraud." [Quoting *State ex rel. Citizens for Responsible Taxation*, 65 Ohio St.3d at 172, 602 N.E.2d 615.] The relevant example in the Election Official Manual recognizes that "arithmetic errors" may occur.

* * *

By their nature, however, "arithmetic errors" should be isolated, unintentional oversights.

The "over-reporting of signatures" (e.g., a circulator statement purporting to witness 28 signatures on a part-petition bearing only two signatures) is so strikingly prevalent in this submission that the suggestion that unintentional "arithmetic errors" are to blame strains credulity. This cannot be the result envisioned by case law; otherwise the exception would swallow the rule.

Secretary of State Directive 2016-01, at 2-3, *http://www.sos.state.oh.us/ SOS/Upload/elections/directives/2016/Dir2016-01.pdf* (accessed Aug. 14, 2016).

**{¶ 70}** After that guidance, the part-petitions were reviewed again and ultimately certified by the secretary of state. Now those part-petitions are before this court.

**{¶ 71}** The secretary of state relied on this court's decisions in explaining his policy on overcounts. We should follow our decisions, too. In *State ex rel. Citizens for Responsible Taxation v. Scioto Cty. Bd. of Elections*, 65 Ohio St.3d 167, 602 N.E.2d 615 (1992), this court held that the board of elections had improperly rejected five part-petitions for overcounting; in each instance the circulator statements "indicated one more signature than each part-petition actually

contained." *Id*. at 171. The court held that incorrectness in the signature count is not fatal to an entire part-petition:

> R.C. 3501.38(E), however, does not expressly mandate a correct signature total, and [*State ex rel.*] *Loss* [*v. Lucas Cty. Bd. of Elections*, 29 Ohio St.2d 233, 233, 281 N.E.2d 186 (1972)] implies that arithmetic error will be tolerated, but only if the error does not promote fraud. Indeed, *Loss* may explain why the Secretary of State instructed respondents here to reject an entire part-petition only where the circulator states a number "*less* than the total number of *uncrossed out* signatures" (emphasis *sic* ) and to, in effect, overlook discrepancies in the number of signatures "in all other instances."

(Emphasis sic.) *State ex rel. Citizens for Responsible Taxation* at 172.

**{¶ 72}** This court "accept[ed] the Secretary of State's reading of the signature-total requirement, see *State ex rel. Beck v. Casey* (1990), 51 Ohio St.3d 79, 81, 554 N.E.2d 1284, 1286, and conclude[d] that respondents improperly rejected the instant five part-petitions for noncompliance with R.C. 3501.38(E)." *Id*. at 173.

**{¶ 73}** A few months ago in *OMA I*, this court dealt with respondents' argument that as a matter of law, part-petitions can never be rejected on the basis of an overcount. Respondents relied on *Citizens for Responsible Taxation*, but this court's opinion stated that "*Citizens for Responsible Taxation* did not hold that an overcount can *never* promote fraud." *OMA I*, ___ Ohio St.3d ___, 2016-Ohio-3038, ___ N.E.3d ___, at ¶ 20. At that time, this court recognized that whether an overcount promotes fraud should determine whether the overcount should result in the disqualification of an entire part-petition. Today, *any* overcount results in complete disqualification.

**{¶ 74}** In *OMA I*, the court reviewed this court's jurisprudence on how to treat undercounts; again, the presence of fraud is a determining factor:

> In cases in which the circulator's statement slightly *undercounts* the signatures, this court has ordered the entire part-petition counted, so long as there is no indication of fraud or material misrepresentation. *State ex rel. Curtis v. Summit Cty. Bd. of Elections*, 144 Ohio St.3d 405, 2015-Ohio-3787, 44 N.E.3d 261, ¶ 8; *State ex rel. Schwarz v. Hamilton Cty. Bd. of Elections*, 173 Ohio St. 321, 323, 181 N.E.2d 888 (1962). Only when the circulator *knowingly* submits an undercount has the court invalidated the entire part-petition. *See, e.g.*, *Rust v. Lucas Cty. Bd. of Elections*, 108 Ohio St.3d 139, 2005-Ohio-5795, 841 N.E.2d 766, ¶ 13–14.

(Emphasis sic.) *OMA I* at ¶ 19.

**{¶ 75}** Has the longstanding practice of disqualifying undercounts and allowing overcounts been completely reversed? At the very least, shouldn't the majority employ the "indication of fraud or material misrepresentation" test on the overcounts in his case?

**{¶ 76}** Instead, this court decides for the first time in this case that any overcount invalidates an entire part-petition. This court makes no attempt to determine whether fraud occurred in any instance or whether an error may have been one of arithmetic or a simple oversight. As an example, consider Lucas County part-petition no. 000285. The part-petition contains 27 signatures (19 ultimately were determined to be good by the board of elections), but the circulator attested to witnessing 28 signatures. The signatures of all 19 registered voters who signed that part-petition do not count. What about Ashland County part-petition no. 000015? It contains at least 27 signatures (20 of which were ultimately

26

determined to be valid by the board), with what is perhaps the start of a 28th signature marked out. The circulator attested to 28 signatures, and this court has invalidated the entire part-petition. Franklin County part-petition no. 000230 has 26 signatures (21 were determined to be valid) and two other signature spaces with an "X" through them. The circulator attested to 28 signatures; all 21 valid signatures are now discounted. Carroll County part-petition no. 000001 contains 27 signatures and has three "X"'s placed on signature line 14. The circulator attested to 28 signatures; the 25 found valid by the board of elections have now been disqualified by this court. Warren County part-petition no. 000066 contains 25 signatures, and a large "X" fills the last three signature lines on the part-petition. The circulator attested to 28 signatures; the 16 deemed valid by the board of elections have been disqualified by this court. This quick, nonexhaustive count of just these part-petitions involves over 100 different registered voters whose signatures were collected by five different circulators in five different counties. Those signers' desire to place the proposal petition in front of their elected representatives has been thwarted by this court's one-size-fits-all mandate on overcounts.

{¶ 77} Instead of reviewing the individual part-petitions, this court has relied on an exhibit submitted as evidence by relators. That exhibit, according to a supporting affidavit, is a spreadsheet created by the "Litigation Support Manager" at Bricker & Eckler, L.L.P. ("Bricker"), relators' counsel, "based upon Bricker's review of the part-petitions." The spreadsheet notes the instances in which Bricker has determined that a circulator attested that he or she witnessed 28 signatures when the part-petition did not contain 28 signatures. The spreadsheet also includes the number of valid signatures contained on each of those part-petitions, to make this court's invalidation of signatures of registered voters easy.

{¶ 78} There are also a large number of part-petitions in this case containing just one signature, when the circulator has attested to witnessing 28. If the

requirement that a circulator state the number of signatures personally witnessed " 'is a protection against signatures being added later.' *State ex rel. Loss v. Lucas Cty. Bd. of Elections*, 29 Ohio St.2d 233, 234, 281 N.E.2d 186 (1972)," majority opinion at ¶ 44, why is the majority disqualifying all the part-petitions that contain only one signature. Where are the signatures that could have been added later? They are not on the part-petitions.

{¶ 79} The majority decision is "too technical, unreasonable and arbitrary," a mistake this court has warned boards of elections against. *See State ex rel. Schwarz v. Hamilton Cty. Bd. of Elections*, 173 Ohio St. 321, 323, 181 N.E.2d 888 (1962). The majority decision has implications at every level: every person running for offices—from school board member to governor to coroner, and those who support them—should live in fear that small mistakes will lead to the invalidation of entire part-petitions and the end to candidacies.

Circulator Addresses

{¶ 80} The majority disqualifies 632 signatures on the part-petitions submitted by Kacey Veliquette, a transient circulator. The majority, paying extreme short shrift to respondents' argument that the permanent-address requirement violates the First Amendment to the United States Constitution, writes that "her part-petitions could be deemed valid only if we were to rule that it is unconstitutional to require circulators to provide *some means* of locating them." (Emphasis sic.) Majority opinion at ¶ 40. But Veliquette has provided a way to locate her: paid circulators must provide "the name and address of the person employing the circulator to circulate the petition, if any." R.C. 3501.38(E)(1). She provided that address. And her affidavit has been filed in this case, so she has been located. Only the 632 verified signatures that she collected from registered voters are missing.

Remedy

**{¶ 81}** The majority gives respondents ten days to gather additional signatures in support of their proposal petition, but to what end? First, we must overcome the absurdity of the majority's continued belief that the processes under Article II, Section 1g apply to proposal petitions. Pursuant to Article II, Section 1g, the secretary of state must determine the sufficiency of the additional petitions "not later than sixty-five days before the election." When is "the day of the election?" It is unknowable at this point, because the election date is measured from the date of the filing of the *supplemental* petition—pursuant to Article II, Section 1b, the proposal shall be submitted to the electorate at the "next regular or general election occurring subsequent to one hundred twenty-five days after the supplementary petition is filed." There has been no supplementary petition filed. So by what date must the secretary of state make his sufficiency determination regarding the additional signatures? How does one count 65 days from never? Under Article II, Section 1g, any challenge to the additional signatures must be made "not later than fifty-five days before the day of the election." Again, it is unknowable what that date is, other than that it is probably ten days closer to never.

**{¶ 82}** But let us assume, as the majority does, that the Article II, Section 1g challenge process does apply to proposal petitions. That section grants initiative proponents ten additional days to file additional signatures "if the petition or signatures are determined to be insufficient." The majority gives respondents that extra ten days, but then what? The majority says that if, after respondent's submission of additional signatures, the secretary of state determines that there are a sufficient number of valid signatures, "then he shall resubmit the initiative to the General Assembly, in accordance with the terms of Ohio Constitution, Article II, Section 1b." Majority opinion at ¶ 47. I assume that this directive means that the secretary of state will transmit the part-petitions to the General Assembly as soon as any challenge to the additional signatures has run its course—though measured

by a timeline with benchmarks related to the "day of the election," (which will have to be ignored) the collection, review, and challenge process can consume up to 40 days—likely sometime in September 2016. But in the meantime, respondents have been seriously prejudiced.

{¶ 83} Respondents have given up trying to get their initiative on the November 2016 ballot; they wrote in their "Notice of continued circulation of supplemental petition," filed in this court on July 13, 2016:

> Although Respondent Secretary's actions adversely affected Petition Respondents' ability to submit their Supplementary Petition before the deadline to appear on the November 2016 ballot, Petition Respondents have until September 2, 2016 to collect a sufficient number of signatures to place the Ohio Drug Price Relief Act on the 2017 general election ballot, which they plan to do.

{¶ 84} The four-month period for consideration of their proposal initiative by the General Assembly under Article II, Section 1b did not end until June 4. Respondents could not begin to collect signatures on supplementary part-petitions until that date. Pursuant to Article II, Section 1b, they had 90 days to collect signatures from an additional 3 percent of the electorate. However, because of the month-long delay in transmitting the proposal petition to the General Assembly at the front end, respondents had just over 30 days to obtain their supplementary signatures if they wanted to get their initiative petition on the November 2016 ballot. This is because the initiative goes on the ballot at the next scheduled election "occurring subsequent to one hundred twenty-five days after the supplementary petition is filed." Ohio Constitution, Article II, Section 1b. The 125-day deadline for the 2016 ballot was July 6, 2016. Despite the fact that they now are not going to seek to reach the ballot until 2017, respondents have another deadline looming.

Their supplementary petition—with its attendant signatures from an additional 3 percent of the electorate—has to be submitted to the secretary of state within 90 days of the expiration of the General Assembly's four-month consideration period, which ended on June 4, 2016. That 90-day deadline expires September 2, 2016. Without knowing how this court was going to respond to relators' challenge, respondents had to keep collecting signatures. If this court had announced a decision rejecting all of relators' challenges today, respondents would have had only 18 days to collect an additional 91,000 plus valid signatures. Now, all the work that respondents have done since June 4, 2016, has been wasted. They have been told by this court that the curative period to collect additional signatures required for the proposal petition can actually cure very little. They have to resubmit the proposal petition and then gather another additional 91,000 signatures on the supplementary petition. This is fundamentally unfair and the wrong interpretation of Article II, Section 1g.

{¶ 85} The majority opinion's remedy runs contrary to the curative process of Article II, Section 1g, which exists to allow for deficiencies in petitions to be corrected. The cure relates back to the time of the deficiency. For instance, a supplemental petition must be filed within 125 days of the next election. Article II, Section 1g provides that "[i]f the petitions or signatures are determined to be insufficient, ten additional days shall be allowed for the filing of additional signatures to such petition." This gives initiative supporters ten days to cure their deficiency by gathering additional signatures. Under Article II, Section 1g, the appeal-and-review process can last until 45 days before the election. Once that is complete and the additional signatures are judged sufficient to make up the deficiency, the initiative goes on the ballot. That is, despite the fact that the deficiency is corrected inside of 125 days before the election, it is as if the supplementary petition had sufficient signatures *before* the 125-day deadline. The curative fix relates back to the original filing of signatures.

**{¶ 86}** Likewise, the additional signatures in this case, if certified by the secretary of state, should relate back to the secretary of state's February 4, 2016, transmission of the proposal petition to the General Assembly. The fix would establish that the proposal was indeed properly before the General Assembly for its four-month review. The four-month review did happen, and it ended on June 4. The rest of the timetable should continue forward from that—leaving respondents until September 2, 2016, to file their supplementary petition to get on the 2017 ballot.

**{¶ 87}** But no, the majority writes, the proposal petition is fixed only as of the date the additional signatures are verified. But what if we were to apply that logic to a case in which a supplemental petition did not contain sufficient signatures 125 days before the election but the initiative supporters corrected that in the ten-day curative period? According to the majority, the supplemental petition would not meet the signature threshold until the curative additional signatures were added, measured from the date that they were added. The initiative would fail to qualify for the ballot at the next election, because the 125-day deadline would have been missed. We know that is not the case because under Article II, Section 1g, the challenge process continues, measured from the date established as the election day by the originally defective supplemental petition.

**{¶ 88}** The curative nature of the additional signatures relates back to the deficiency in the petition that they are curing. So respondents should have ten days to fix any deficiency, and that fix should relate back to the proposal submission to the General Assembly of February 4, 2016.

Conclusion

**{¶ 89}** The majority says, "It is generally our obligation to defer to the secretary of state's reasonable interpretation of an election statute. *State ex rel. Cornerstone Developers, Ltd. v. Greene Cty. Bd. of Elections*, 145 Ohio St.3d 290, 2016-Ohio-313, 49 N.E.3d 273, ¶ 16." Majority opinion at ¶ 26. The secretary of

state has determined that there were sufficient registered voters from the requisite number of counties who actually signed the part-petitions that were timely filed and twice checked by local, properly trained election officials to assure that the signatures matched the voter-registration cards. We should defer to that judgment.

{¶ 90} The sweeping reach of this per curium opinion—handed down without parentage and without oral argument—marks a sea change for the Ohio Supreme Court. In *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St. 3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, this court made it clear that Ohio citizens have little hope to meet the requirements to challenge enactments of the General Assembly in the courts of Ohio. Now, the court chooses to make it extremely difficult for Ohio citizens to even politely exercise their fundamental constitutional right to petition the General Assembly to take action on important matters affecting millions of Ohio citizens. The fallout from today's decision will undoubtedly multiply the challenges to both state and local citizen petitions of all types as well as to the efforts of any citizen seeking to stand for election to public office. Any suggestion that our court's decision is protecting Ohio citizens from election fraud is a complete fiction. What we have is a government protecting itself from its people. Today, the walls got higher.

———————————

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Anne Marie Sferra, Nelson M. Reid, and James P. Schuck, for relators.

McTigue & Colombo, L.L.C., Donald J. McTigue, J. Corey Colombo, and Derek S. Clinger, for respondents William S. Booth, Daniel L. Darland, Tracy L. Jones, and Latonya D. Thurman.

Michael DeWine, Attorney General, Steven T. Voigt, Senior Assistant Attorney General, and Brodi J. Conover, Assistant Attorney General, for respondent Ohio Secretary of State Jon Husted.

———————————